**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TRINITY TECHNICAL GROUP, INC.** | § | **Cause No.** _____ |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Patent Infringement Case** |
| | § | |
| **SIEMENS INDUSTRY, INC.** | § | **Jury Trial Requested** |
| | § | |
| *Defendant* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, Trinity Technical Group, Inc., and files this Complaint against Siemens Industry, Inc., and respectfully shows the Court as follows:

### I.
### THE PARTIES

1.     Trinity Technical Group, Inc. ("TTG") is a Texas Corporation with its principal place of business at 2118 Royal Dominion Court, Arlington, Texas 76006-4836.

2.     Defendant, Siemens Industry, Inc. ("Siemens") is a Delaware Corporation having its principal place of business at 170 Wood Avenue South, Iselin, New Jersey 08830-2741.  Siemens may be served by and through its Registered Agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

## II.
## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising out of the patent laws of the United States, Title 35 of the United States Code.  This Court has jurisdiction of the patent infringement, and other related claims that are part of the same controversy, pursuant to 28 U.S.C. § 1331, 1338, and 1367.

4.      Personal jurisdiction exists over Siemens because it has sufficient minimal contacts with the forum as a result of business conducted within the State of Texas and within the Northern District of Texas, including maintaining offices throughout the State of Texas and at 1401 Nolan Ryan Expressway, Arlington, Texas.  Additionally, Siemens has subjected itself to jurisdiction by its conduct in making, using, selling, offering to sell and/or importing infringing products within the State of Texas and within the Northern District of Texas.

5.      Venue is proper in this Court under 28 U.S.C. § 1391 because Siemens may be found in this Judicial District (having offices at 1401 Nolan Ryan Expressway, Arlington, Texas); Siemens is subject to personal jurisdiction within this Judicial District; and a substantial part of the events or omissions giving rise to this lawsuit occurred in this Judicial District.  Venue is also proper under 28 U.S.C. § 1400(b) because Siemens may be found in the Judicial District, has a regular and established place of business in the Judicial District, and has committed acts of infringement in the Judicial District.

## III.
## THE PATENTS

6.      On December 27, 2011, U.S. Patent No. 8,086,346 (the "346 Fingerprint Patent") entitled "Processing of Undeliverable as Addressed Mail" was duly and legally issued by the U.S. Patent Office.  A true and correct copy of the 346 Fingerprint Patent is attached as Exhibit A.  TTG holds all rights, title and interest to the 346 Fingerprint Patent, including the right to enforce the Patent.

7.      On November 13, 2012, U.S. Patent No. 8,331,667, a continuation of the 346 Fingerprint Patent entitled "Processing of Undeliverable as Addressed Mail," was duly and legally issued by the U.S. Patent Office.  A true and correct copy of U.S. Patent No. 8,331,667 (the "667 Continuation Patent") is attached as Exhibit B.  TTG holds all rights, title and interest to the 667 Continuation Patent, including the right to enforce the Patent.

8.      On September 6, 2012, a Notice of Allowance on Application No. 12/181,884 (the "884 IMB App") entitled "Determining Disposition of Undeliverable as Addressed Mail" was issued, and a patent is pending on the claims in the application.  True and correct copies of the 884 IMB application, amendment and Notice of Allowance are attached as Exhibit C.  TTG holds all rights, title and interest to the claims in the 884 IMB Application.

9.      The prosecution timeline with regard to these patents is as follows:

   a.   April 24, 2007:  provisional patent application filed for the 346 Fingerprint Patent and the 667 Continuation Patent.

   b.   December 4, 2007 and March 17, 2008:  provisional patent applications filed for the 884 IMB Application.

   c.   April 24, 2008:  application for the 346 Fingerprint Patent filed.

   d.   July 29, 2008:  884 IMB Application filed.

    e.   October 30, 2008:  application for the 346 Fingerprint Patent published.

    f.   June 04, 2009:  884 IMB Application published.

    g.   November 28, 2011:  application for the 667 Continuation Patent filed.

    h.   March 22, 2012:   application for the 667 Continuation Patent published.

**IV.**
**FACTUAL OVERVIEW**

10.     Trinity Technical Group, Inc. and its current and former principals are the inventors of the Patents, technology, and intellectual property at issue in this lawsuit, which generally represent significant improvements in the methods for intercepting, handling and processing of mail that is "Undeliverable as Addressed" ("UAA").  TTG's methods and technology would eliminate various steps and/or pieces of machinery and/or phases of processing for UAA mail, by the creation and use of various processes and technological improvements that, upon implementation, would represent a substantial savings to any postal service entity that processes UAA mail.

11.     In April, 2008, TTG had discussions with Siemens regarding the potential for licensing its intellectual property, including TTG's now patented fingerprint and IMB technology and improvements.

12.     On or about May 1, 2008, TTG provided Siemens with a summary description of its "Optimized Undeliverable as Addressed (UAA) Detection, Interception, and Processing" technology.  That document explained the "Opportunity" provided by TTG's new technology, methods and processes which, when applied, would result in an estimated $160 million in annual cost savings to the United States Postal Service from reduced mail handling and processing related to UAA mail.

13.     At a meeting on May 20, 2008, TTG provided Siemens with a confidential and proprietary power-point presentation, titled "Optimized UAA Detection, Interception and Processing" including two case examples, specifically annotated as "Patents Pending," which used flow charts and diagrams to depict the improvements in current UAA mail processing that would be achieved if TTG's new methods, processes, and technology were implemented.

14.     In June of 2008, Siemens indicated to TTG that it had not yet decided how it wanted to proceed, telling TTG that it was "currently evaluating several scenarios."

15.     In August of 2008, Siemens told TTG that its review of TTG's intellectual property  was taking longer than planned but specifically told TTG that it would be back in touch with TTG once it had "completed [its] review and determined the applicability and value of your claims" as reflected in the Fingerprint and IMB Patent applications.

16.     In October of 2008, Siemens provided TTG with an update indicating that it was still reviewing the "value and patentability" of TTG's intellectual property and suggesting that applicability and value could be "more meaningfully" addressed once Siemens completed its review of the patentability questions.

17.     Discussions regarding the patentability of TTG's intellectual property continued, and in late November of 2008, Siemens reported it was "making progress" and requested additional time.

18.     To facilitate further discussions between Siemens and TTG, Siemens told TTG that all parties would be required to sign a non-disclosure agreement prepared by Siemens, titled "Confidentiality Agreement," for the stated *"Purpose: To determine whether TTG has*

*additional technology that Siemens may desire to procure in order to supplement the Information."*   "Information" was defined in the Confidentiality Agreement as *"Siemens and USPS related technological and business information related to the postal automated redirection system, including undeliverable as addressed mail, mail sorting and image capture and video encoding*."  TTG signed the Confidentiality Agreement, as requested.

19.     Siemens continued to review TTG's intellectual property, including the patent applications and associated drawings specifically requested and received, and in December of 2008 requested a meeting with the representatives of TTG, purportedly to discuss a potential licensing agreement in more detail.

20.     Siemens requested that TTG deliver another presentation that included the "content and application domain" of TTG's intellectual property.  Siemens specifically asked for "charts and highlighted drafts of" the TTG patent claims, specifically the 346 Fingerprint Patent, "Processing of UAA Mail," and the 884 IMB App, "Determining Disposition of UAA Mail."  Siemens stated it wanted to *"[u]nderstand precisely from TTG what your patents cover and in that context review and discuss your Claims – so we will all agree what are the crucial assets you wish to sell or license."*  Siemens agreed that it would present information regarding the volume of UAA mail that would be positively impacted through the use of TTG's intellectual property, and then *"begin discussion of various purchasing and licensing arrangements and payment model thereof."*

21.     At a meeting on January 27, 2009, TTG presented Siemens with the additional requested information concerning TTG's intellectual property.  After TTG disclosed the requested details of its technology to Siemens, Siemens identified what it recognized as the

potential revenue to be generated using TTG's technology within Siemens's then-existing contracts and costs models with USPS.  However, while Siemens clearly recognized the substantial value of its using TTG's technology in conjunction with its Postal Automated Redirection System ("PARS") (between 26 and 32 million dollars), Siemens made no meaningful offer to purchase or license that technology.

22.    Despite the lack of a meaningful offer from Siemens, TTG continued attempting to explain the value of its technology to Siemens, believing at the time that Siemens was negotiating in good faith.  However, Siemens stood by its refusal to make a meaningful offer for TTG's technology and reported on March 19, 2009 that it would not participate in further negotiations for license or purchase of TTG's technology.

23.    On August 16, 2010, Siemens announced it had been awarded an $80 million contract with the United States Postal Service ("USPS"), for Postal Automated Redirection System "*software and computer hardware enhancements…to increase system performance, read rates, error rates, and processing functionality.*"[1]  PARS is the system used by the USPS to process UAA mail.  According to the statement of work from the USPS, the PARS upgrade contract awarded to Siemens included "*a new fingerprinting technique known as Advanced Reader Technology (ARTid) to yield significantly improved interception rates.*"[2] Siemens Logistics newsletter for January 2011 referred to its new "*fingerprint technology….which goes by the name of ARTid*" and "*works with the visible features of the parcel throughout the process.*"[3]    These descriptions of the technology that Siemens had

---

[1] *See* contract announcements at Exhibit D.

[2] *See* Exhibit E, PARS Phase 4, General Requirement.

[3] *See* Exhibit F, January 2011 Siemens Logistics Newsletter, page 4.

sold to the USPS -- in fact -- describe TTG's intellectual property, which TTG began discussing with Siemens in April of 2008 and which is the subject matter of the various patents (and pending patents) at issue here.

24.     Upon information and belief, Siemens holds no US patents for this technology.

## V.
## PATENT INFRINGEMENT

### A) 346 Fingerprint Patent

25.     TTG repeats and reasserts the allegations above as if fully set forth herein.

26.     The 346 Fingerprint Patent is valid and enforceable.

27.     Upon information and belief, Siemens has infringed and continues to infringe the 346 Fingerprint Patent by making, using, selling, offering for sale and/or importing in or into the United States, without authority, products that fall within the scope of the 346 Fingerprint Patent, in violation of 35 U.S.C. § 271, specifically including, but not necessarily limited to, the products and services sold to the United States Postal Service in accordance with the August 12, 2010 contract.

28.     Siemens's conduct in making, using, selling, offering for sale and/or importing in or into the United States, without authority, products that fall within the scope of the 346 Fingerprint Patent has also induced infringement of the 346 Fingerprint Patent under 35 U. S. C. § 271(b).

29.     Siemens's conduct in making, using, selling, offering for sale and/or importing in or into the United States, without authority, components that fall within the scope of the 346 Fingerprint Patent has also contributed to the infringement of the claims of the 346 Fingerprint Patent under 35 U. S. C. § 271(c).

30.     Upon information and belief, Siemens has offered to sell, sold, or imported components that fall within the scope of the 346 Fingerprint Patent — which form a material part of the invention of the 346 Fingerprint Patent and have no substantial non-infringing uses — for use in practicing a patented process.

31.     Siemens knew or should have known of the 346 Fingerprint Patent, but engaged in the infringing, inducing and contributing conduct nonetheless.   Siemens had actual knowledge of the claims and components of the 346 Fingerprint Patent, but has engaged in the infringing, inducing and contributing conduct nonetheless.   Therefore, Siemens's infringement is willful.

32.     As a direct and proximate result of Siemens's acts of patent infringement, TTG has been and continues to be injured and has sustained and will continue to sustain substantial actual damages in an amount not presently known.

33.     TTG has incurred and will continue to incur attorneys' fees, costs and expenses in the prosecution of this action for patent infringement.  The circumstances of this dispute create an exceptional case within the meaning of 35 U.S.C. § 285 such that TTG is entitled to recover its reasonable and necessary fees.  Additionally, TTG is entitled to up to three times actual damages as a result of Siemens willful infringement under 35 U.S.C. § 271.  Siemens's conduct with regard to the intellectual property of TTG was and is deliberate, intentional, malicious, motivated by a desire for maximum financial gain combined with harm to TTG, and without just cause or excuse.

**B) <u>667 Continuation Patent</u>**

34.     TTG repeats and reasserts the allegations above as if fully set forth herein.

---

35.     The 667 Continuation Patent is valid and enforceable.

36.     Upon information and belief, Siemens has infringed and continues to infringe the 667 Continuation Patent by making, using, selling, offering for sale and/or importing in or into the United States, without authority, products that fall within the scope of the 667 Continuation Patent, in violation of 35 U.S.C. § 271, specifically including, but not necessarily limited to, the products and services sold to the United States Postal Service in accordance with the August 12, 2010 contract.

37.     Siemens's conduct in making, using, selling, offering for sale and/or importing in or into the United States, without authority, products that fall within the scope of the 667 Continuation Patent has also induced infringement of the 667 Continuation Patent under 35 U. S. C. § 271(b).

38.     Siemens's conduct in making, using, selling, offering for sale and/or importing in or into the United States, without authority, components that fall within the scope of the 667 Continuation Patent has also contributed to the infringement of the claims of the 667 Continuation Patent under 35 U. S. C. § 271(c).

39.     Upon information and belief, Siemens has offered to sell, sold, or imported components that fall within the scope of the 667 Continuation Patent — which form a material part of the invention of the 667 Continuation Patent and have no substantial non-infringing uses — for use in practicing a patented process.

40.     Siemens knew or should have known of the 667 Continuation Patent, but engaged in the infringing, inducing and contributing conduct nonetheless.   Upon information and belief, Siemens had actual knowledge of the claims and components of the

---

667 Continuation Patent, but has engaged in the infringing, inducing and contributing conduct nonetheless.  Therefore, Siemens's infringement is willful.

41.     As a direct and proximate result of Siemens's acts of patent infringement, TTG has been and continues to be injured and has sustained and will continue to sustain substantial actual damages in an amount not presently known.

42.     TTG has incurred and will continue to incur attorneys' fees, costs and expenses in the prosecution of this action for patent infringement.  The circumstances of this dispute create an exceptional case within the meaning of 35 U.S.C. § 285 such that TTG is entitled to recover its reasonable and necessary attorney's fees and expenses.  Additionally, TTG is entitled to up to three times actual damages as a result of Siemens willful infringement under 35 U.S.C. § 271.  Siemens's conduct with regard to the intellectual property of TTG was and is deliberate, intentional, malicious, motivated by a desire for maximum financial gain combined with harm to TTG, and without just cause or excuse.

**C) <u>Reservation</u>**

43.     TTG hereby gives notice of its intent to do so) to assert claims of patent infringement with regard to the 884 IMB Application (allowed), and any additional continuation or other patents that may be granted for the protection of TTG Intellectual Property at issue, once such Patents are granted.

### VI.
### <u>MISAPPROPRIATION AND UNFAIR COMPETITION</u>

44.     TTG repeats and reasserts the allegations above as if fully set forth herein.

45.     TTG (and those from whom it has properly obtained assignment of intellectual property rights) invented, created and/or developed the intellectual property at issue —

---

including but not necessarily limited to that described in the 346 Fingerprint Patent, the 667 Continuation Patent, and the 884 IMB Patent Application — through the expenditure of substantial labor, skill, and money.

46.    The intellectual property of TTG provides TTG with a unique pecuniary interest not available to others who do not own and/or possess the same intellectual property.

47.    Upon information and belief, Siemens appropriated and used the intellectual property of TTG, without permission, without the burden of the time and expense of development of that intellection property, and in competition with TTG.

48.    Siemens's conduct, including unlawful appropriation and use of TTG's intellectual property, constitutes Misappropriation and Unfair Competition under Texas common law.

49.    Siemens's conduct, including unlawful appropriation and use of TTG's intellectual property, was also intentional, malicious, and without just cause or excuse, for which TTG seeks exemplary damages.

50.    TTG has suffered, and will continue to suffer, substantial commercial damage as a direct and proximate result of Siemens's unlawful appropriation and use of TTG's intellectual property.

## VII.
## CIVIL THEFT

51.    TTG repeats and reasserts the allegations above as if fully set forth herein.

52.    TTG (and those from whom it has properly obtained assignment of intellectual property rights) invented, created and/or developed the intellectual property at

issue—including, but not necessarily limited to, that described in the 346 Fingerprint Patent, the 667 Continuation Patent, and the 884 IMB Patent Application.

53.     Upon information and belief, Siemens took, used, offered to sell, and/or sold intellectual property of TTG, which Siemens knew belonged to TTG, without TTG's consent, and with the intent to deprive TTG of the intellectual property and the substantial benefits of same in violation of Texas Civil Practice and Remedies Code Chapter 134 and Texas Penal Code § 31.05(b).

54.     TTG suffered and is entitled to recover for its substantial actual damages caused as a direct and proximate result of Siemens's unlawful theft of intellectual property. TTG is further entitled to recover its costs and reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 134.005(b).

## VIII.
## FRAUD

55.     TTG repeats and reasserts the allegations above as if fully set forth herein.

56.     Siemens's conduct in connection with the intellectual property of TTG, as set forth in more detail in the preceding paragraphs, constitutes common-law fraud and/or fraud by non-disclosure under Texas law.   Siemens made various misrepresentations and/or omissions of material facts (a) relating to its potential desire to purchase and/or license the intellectual property of TTG, (b) designed to induce TTG to reveal details regarding its intellectual property sufficient to allow Siemens to copy and sell that intellectual property as its own and for its own gain, and (c) exclude TTG from realizing the benefits of its own intellectual property.

57.     Siemens made false material representations in its dealings with TTG and TTG's principals, which Siemens knew were false or made recklessly without regard to truth.  Siemens intended that TTG rely upon the false representations in ongoing discussions regarding the potential sale or licensing of TTG's intellectual property.  TTG did, in fact, rely on the false representations and disclosed details regarding its intellectual property not otherwise available to Siemens, which resulted in substantial harm to TTG and its rights to and value in the intellectual property.

58.     Siemens further concealed and/or deliberately failed to disclose material facts to TTG in connection with its dealings with TTG and TTG's principals regarding TTG's intellectual property, which Siemens had a duty to disclose under the circumstances and which Siemens knew TTG did not know and did not have an equal opportunity to discover. Siemens intended to induce TTG to reveal details of its intellectual property not otherwise available to Siemens, which TTG did disclose and Siemens then used, resulting in substantial harm to TTG and its rights to and value in the intellectual property.

59.     Siemens's fraud was the direct and proximate cause of economic injury to TTG.  Further, because Siemens acted fraudulently, with gross negligence, and with malice, TTG is entitled to recover exemplary damages, under Texas Civil Practice and Remedies Code 41.003.

## IX.
## PRAYER FOR RELIEF

60.     TTG respectfully requests that judgment be entered in its favor on all claims against Siemens, and that the Court enter an order containing the following findings and relief:

_____

a)      a finding that 346 Fingerprint Patent is valid and enforceable;

b)      a finding that Siemens has infringed the 346 Fingerprint Patent;

c)      a finding that 667 Continuation Patent is valid and enforceable;

d)      a finding that Siemens has infringed the 667 Continuation Patent;

e)      a finding that Siemens willfully infringed the patents at issue;

f)      a finding that this case is exceptional pursuant to 35 U.S.C. § 285;

g)      treble damages for Siemens's willful infringement;

h)      actual damages,

i)      exemplary damages;

j)      attorneys' fees, costs and expenses;

k)      pre and post-judgment interest; and

l)      such other and further relief to which TTG may show itself justly entitled and/or as the Court may deem just and proper.

## X.
## JURY DEMAND

61.     In accordance with Federal Rules of Civil Procedure 38 and 39, TTG asserts its right under the Seventh Amendment to the United States Constitution and demands a trial by jury on all issues.

## XI.
## NOTICE OF APPLICABILITY OF MISCELLANEOUS ORDER NO. 62

62.     Miscellaneous Order No. 62 of the Northern District of Texas, Dallas Division, applies to this matter, and all documents and information produced will be governed by the terms and conditions of the Northern District of Texas Protective Order,

provided at Exhibit A to Miscellaneous Order No. 62, a copy of which is attached hereto.[4]

Pursuant to this protective order, immediately applicable to this case, TTG seeks an un-redacted copy of Siemens's records provided in response to TTG's Open Records Request, FOIA Case No. 2012-FPRO-00177, for records reflecting the technology sold via contract number 3AAREC-09-B-0023 awarded to Siemens on August 12, 2010, for improvements in the processing and handling of UAA mail.

Respectfully submitted,

**SHANNON, GRACEY, RATLIFF & MILLER, L.L.P.**

/s/ *Sydney B. Hewlett*
Sydney B. Hewlett
State Bar No. 00798257
Christopher G. Lyster
State Bar No. 12746250
Patrick S. Richter
State Bar No. 00791524
777 Main Street, Suite 3800
Fort Worth, Texas 76102
Telephone:   (817) 336-9333
Facsimile:    (817) 336-3735
shewlett@shannongracey.com
clyster@shannongracey.com
prichter@shannongracey.com

**ATTORNEYS FOR PLAINTIFF**

---

[4] *See* Exhibit G.